Hi, I'm Carl Lopez. I represent the Mason family. Rick Mason was paralyzed at Dungeness Spit National Wildlife Refuge when landslide fell on him. The case was dismissed under the discretionary function exception and we have appealed that dismissal. This was a case where I believe that certainly there was discretion as to whether or not to permit the public to use the wildlife refuge in a limited way. And once that decision was made, of course, there was a duty under statute to protect the public to the fullest extent possible. And then there's a... That's the extent of the discretionary function here to simply decide whether or not to open the wildlife refuge? If that's the case, then every time we open a national park for visitors, everything that happens after that cannot be covered by the discretionary function exception. The law isn't that broad, is it, Mr. Lopez? I think, in addition, there is a discretion involved here to identify hazards. And I believe that that is also discretionary function. And then once the decision is made... Let me return to something else that you said. You said once we exercise our discretion as to whether we let the public in, after that there is a duty to protect the public to the maximum... Would you repeat what you said? To the fullest extent possible. Okay. And I believe that's just from the statute. The regulations of the Department of the Interior that govern wildlife refuge. Right. Okay. I'm simply citing that language. I think then what we have here is what we have is a specific hazard that is in fact... I want to return to that language. I'm sorry. Is that language unqualified? I believe it is unqualified. I mean, we could pack down an escort with everybody who comes in to help protect them. We could issue everybody special shoes. Yeah. I think it's unqualified, but I think necessarily that then there is a discretion in terms of determining, okay, what hazards are we going to actually protect for and which ones do we need to look at? There would almost have to be, wouldn't there? Yes. I mean, I can't think of any duty, common law, or statutory in any place in the United States that has to protect people to the fullest extent possible. No, and I agree with that. I agree with that. In this particular case, we have the refuge has in fact identified a hazard, which is the vulnerability of these bluffs to landslides, and they put out some warning signs. And here is a point where I believe that there is discretion that is taken away. I believe that the sign manual is pretty clear that safety signs, once you put them up, have to be of a certain quality, have certain colors. But that goes to the physical characteristics of the sign. It seems to me that you're trying to read too much into a manual that simply says they have to be of a certain size, dimension, and color. Is it your real argument here, once they made the decisions to sign, they were negligent in not placing a sufficient number of signs in the proper locations so that your clients would have been warned, don't go along these bluffs because you might get hurt? Yes. And what do you point to besides the physical sign manual provision that says that that's not a discretionary function? Well, I think in that circumstance then you get into the line of cases, including Marley's Bear and cases like that, where you say, okay, the decision to warn is a discretionary decision. But the way that that decision, the implementation of the warning is not necessarily a discretionary decision, especially when it relates to matters of safety and public safety. And here in this case, there were a couple of signs put up. We have dispute with the location of the signs and the fact that the warnings weren't on both sides. But we also brought up a number of other issues in terms of opportunities to warn that were not. Counsel, once we made the determination to put up? Well, I don't think that a number of signs is, I don't think there's an obligation necessarily as to the number of signs. I think that it's much more important the location of the signs. And the issue is whether or not there were actual policy considerations that were weighed against each other to determine those locations. And I don't believe there's any evidence on the record that there were actually a balancing of countervailing policy considerations that led to the locations of those signs or to the numbers of those signs. Counsel, if you were to prevail here on your, if you were to prevail on your argument and ultimately in this case, in response to this case, where would the government put up those signs? Well, I think where they should. Would they know where they were supposed to put them up? Well, I think that they should put them up at the bottom of the trail where it spills out, one way towards the bluffs and the other way down the street. Okay, if they didn't put one at the bottom of the trail, would they be liable in any future cases where somebody was injured? They might be because, I think if they put a sign at the bottom of the trail, I think that that probably would have satisfied it, to tell you the truth. Okay. Is putting a sign at the bottom of the trail a good idea or is it required by law? Well, it's definitely a good idea. Okay, but if it's only a good idea, have you got a case? To require it as a matter of law? Right. Well, I think there you go for the issue of is it the kind of policy, the decision behind locating that sign, is that the kind of policy that's meant to be protected by the discretionary immunity function? And I submit it is not. Mr. Lopez, how do you get around our decision? I have to say, I find the case law confusing, to say the least, with all due respect to my court. But how do you get around our decision in Blackburn, which dealt with the diving off of the old stone bridge in Yosemite National Park? We found that the discretionary function exception applied in that case, where the government had posted six signs. And the last time I was across that bridge, it's not a very long bridge. And notwithstanding all these signs, he still dove off the bridge. And we rejected the argument that the discretionary function exception didn't cover the manner in which the government had warned visitors. Blackburn has had the culmination of three cases in 94, 95, and 96 that dealt with National Park Service regulations and statutes. And those are different than the ones that apply here. The National Parks are, in fact, required to balance competing policy considerations of which safety is one, but also scenic nature, things like that. And there is an extensive description of the sorts of balancing, including specifically considering in Blackburn whether or not to post signs or not post signs, or at least discussing blackground. I may have been talking about it. Are you drawing a distinction between the type of government reservation we're talking about, a wildlife refuge versus a national park? Is that what I hear you saying? Well, there's definitely a different statute there and different duties in terms of what it is that the policies that are being balanced. There are policies that apply to the National Park that are described in Blackburn, as well as children's... What do we do with the Forest Service? We've got that case that talks about the snowmobiling accident outside of Yellowstone. So does it make a difference if it's a national forest versus a national park versus a national wildlife refuge? Well, I think that, I think Oberson would be an interesting case to take it, you know, if you had simply moved it onto the National Park Service land, I think that probably there wouldn't have been the duty that applied to the Forest Service. To the Park Service? Well, to the Forest Service if it had been the Park Service. Yeah, I think if that had happened under Blackburn, I think if that had happened in the National Park, there's a good chance that Blackburn would mean that there wasn't liability. But because it happened on the Forest Service land, where they had this duty to warrant, and where they found that in fact, you know, in this situation it does not rise to the level of economic political policy, that there's liability. And I think that this case lies with those cases, with the WisNAP, with the Oberson case, with the Marley's Bear cases, as opposed to the three National Park cases that came in 94, 95, and 96. I mean, one thing about those National Park cases is that there was clear evidence in the record that there was extensive discussion about, okay, how do we manage this risk? You know, we want, on the one hand, we want the public to be able to go into these forests and do some stuff. If we put up warning signs, there's a chance that it might actually attract people. So we don't want to do this, let's put... And the other thing they did in the National Park Service... Do you think there's a difference between Dungeon Nest National Wildlife Refuge, five miles of beach, and Third Beach, or Shy-Shy Beach, and Olympic National Park? Well, it seems that there is, under certainly... Because of the nature of the reservation, or the anticipated use, is that where you're going? Well, yeah, I mean, there seems to clearly be a difference where the National Parks are concerned. But I will say in these cases that there was very specific policies that were actively addressed and balanced. We do not have that in this case. You know, the idea that there really isn't a description of these competing policies that were considered in terms of sign placement. I mean, if there were, they're not in the record. Okay, you have exhausted your time. We'll give you a little arm of rebuttal, but let me hear from Mr. Lynch. Good morning, Your Honor. Phil Lynch for the United States. And I'd like to begin with the Court's question to Mr. Lopez about the... The... The... The... The... The... The... The... The mandate of the Refuge Manager here, Kevin Ryan, ensuring the safety of the public to the fullest degree possible is part of the Code of Federal Regulations, Section 50 CFR 25.21B. Does that only apply to wildlife refuges? Is that policy not carried through with regard to National Parks or National Forests? They have similar regulations, Your Honor, but I think from the perspective of what's the difference between a National Park and a wildlife refuge, Mr. Ryan addressed that in his declaration. In a wildlife refuge, as he puts it, wildlife first. That is his mandate. He is supposed to protect wildlife, and even to the extent that the areas in the wildlife refuge are presumed not to be open to the public unless the Refuge Manager makes the decision that it's compatible with protecting wildlife. And that's what we have here. The Dungeness Spit is a very unusual geographic feature, and Mr. Ryan goes through in his declaration the number of fish and wildlife species that use the spit and the water around the spit. It's clear that his mandate is to protect wildlife first, and in his declaration he's talking about the bluff area. And this is at the excerpt of record page. We've read the declaration. So is your position that if the Park Service is faced with a similar problem with regard to mountain goats in Olympic National Park, or the National Forest and that in those cases, visitor safety has to come first because the primary mandate of the agency is to protect visitors as opposed to the wildlife and the resource? No, Your Honor. I think that what Mr. Ryan has to do, and individuals in similar positions, is balance. Obviously, they're a competing interest. But what I'm hearing you say is wildlife refuges get to give greater balance to the wildlife because they're wildlife refuges, whereas these other government reservations may give the balance more to the visitor. Yes, Your Honor. I believe that's correct. If that's the case, then why did we deny or invoke the discretionary function exception to deny coverage in Glacier National Park? Sorry, that's a case that's on the calendar. Never mind. I'll withdraw that question. I'll save that one for the decision conference. Go ahead. Blackburn. Blackburn, I think, is the appropriate case to use as an analogy to this case. In Blackburn, the panel discussed in its opinion the fact that there was a balancing test and decided that it was within the discretionary function of the agency to decide not to erect barriers or additional signs, that it was up to the manager to decide what sort of safety measures needed to be taken in that case. I'd like to also address the idea of the location of the signs. Mr. Ryan, in his declaration, discussed the fact that both he and previous refuge managers had looked at where the signs should be and had also decided what other measures needed to be taken. Because they wanted to preserve the nature of this area as a wildlife refuge, had decided that the signs that they used were appropriate and that the pamphlet that they gave to visitors described the area, discussed the fact that visitors were supposed to stay on the paths. Another factor that should be considered by the court is the very nature of these blocks. The pictures clearly demonstrate that these are not stable areas. These are not areas that would be safe to walk, that the spit is comprised of material that comes from the blocks, both by current and wind. Isn't that arguing the merits of the negligence issue, not really the discretionary function test? Or are you saying it's such a hazard that signage is an evaluation at a public policy level? Yes, Your Honor, that it is a public policy level for Not a low-level decision, a high-level decision? Mr. Ryan, as the refuge manager for a number of these areas, he is not a low-level person. This is someone making a policy decision after balancing the different needs that he has as the manager of the wildlife refuge. Can you address Oberson? Yes, Your Honor. In Oberson, the Park Service had decided to warrant the trails and that they had done a warrant, what they called the warranting process, at 35 miles an hour. When they raised the speed limit to 45 miles an hour, they did not go through again and determine the risk to the public when the speed limit had been raised to 45 miles an hour. So the court decided that the decision to do the warranting process was protected by discretionary function exception, but once the warranting process was started, it had to be done in a manner to protect the public. And in this particular curve where that accident occurred, the court found there had been a previous accident that they were aware of and that it was not a safe area and should have been posted as dangerous. And actually in that case, it previously had been 35 and then they increased it to 45. And they said that there wasn't an analysis to say, would that be safe at 45? Right. And there weren't competing policy interests. It was simply a matter of protecting the public. One of the claims is that the Fish and Wildlife Service here did not put up the appropriate signs. Now, if that were a contributing cause to this accident, if the sign had been visible to the masons but was written in such small type that you couldn't actually read what the warning sign said, so you could see the sign but you couldn't read what it said, would that be a different case? Your Honor, I believe that for Mr. Ryan, the place where the signs are put is what is important here. What you're saying is if the sign had been, are you saying larger, the sign language? There are a whole series of regulations that govern the kind of sign that you put up, what kind of border it's supposed to have and how large the typeface is supposed to be and whether it's on both sides of the post and so forth. Now, if that were a contributing cause here to this accident, wouldn't that be a different case because there it appears that the requirements are mandatory. The decision as to what kinds of signs we put up is discretionary, but once we decide to put up signs, then the service knows exactly what it's supposed to do. But the location of the sign? The location is different, but once we decide that we're going to put a sign here, we know how big that sign is supposed to be, we know how big the lettering is supposed to be, we know what color the sign is supposed to be. Your Honor, the sign language certainly appears to say this is the type of sign that it should be used. And I would point to the Ninth Circuit's decision in Blackburn where there was even more detailed language, and the Court in that case held that it was guidance and that the manager still had the discretion to decide what sort of signs were to be used.  As Mr. Ryan says in his declaration, he was considering maintaining the refuge nature of the spit and that he did not want large, uprooted signs, that he was concerned about how the area would look. So even if the Court considered that the language or the type of placement of the signs is still the discretionary part of what Mr. Ryan did in this case. And I see that my time is almost up. I'd be happy to entertain any other questions that the Court has. I think not. Thank you very much, Mr. Lynch. Mr. Lopez, I'll give you a minute on rebuttal. Thank you, Your Honor. We identified a number of things that actually were done in Blackburn, and that line of cases, things like putting warnings in brochures, having people actively warn, and various other things. In this case, I can find nothing. There doesn't seem to be any policy that weighs against locating a sign, for example, at the foot of the trail. There's no policy, there's no indication that there was some kind of consideration for having a sign there and a reason why it wasn't put there. There also is no response to the idea that the people who greet and take your money give some kind of warning, or simply having a warning in the brochure. There's no other... As if there's no consideration doesn't really answer the question as to whether there's discretion. Don't they have discretion as to whether they have that discussion? Well, I hear what you're saying, but it seems that in Summers, anyway, the suggestion is that if you don't have that discussion, that it wasn't a policy decision. That if you didn't consider competing policies, then you can argue... How could it not be a policy decision? Because the Fish and Wildlife Service is going to have to figure out how to deal, how to structure its agenda, whether to discuss an oil spill or whether to discuss putting up signage. Even the governing of the agenda, that is, what do you talk about, where are our priorities for the coming year, would seem to be a discretionary decision, wouldn't it? Doesn't it have to be? I think it's definitely that. I would agree that certainly policies of where we put our I just fall back on, it looks like these cases are looked at case by case, and that the line of cases that it seems to me that our case falls into seems to be the Wisnat, Oberson, Marley's Bear line of cases, as opposed to the National Park line of cases. Thank you very much, counsel. The case just argued is submitted. And the next case, La
judges: Tallman, Bybee, Huff